UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
No. 7:09-CV-169-BO

| | |
|---|---|
| EMORY UTILITIES, INC. and BASIL WILLIAMS,<br><br>          Plaintiffs,<br><br>v.<br><br>TIME WARNER CABLE, INC., and CHRISTOPHER HAIRR,<br><br>          Defendants. | O R D E R |

This matter is before the Court on Defendants' Motion to Dismiss. For the reasons below, Defendants' Motion is GRANTED IN PART and DENIED IN PART.

## BACKGROUND

Plaintiff Basil Williams first worked with Defendant Time Warner Cable ("TWC") in 1994 as an employee of a contractor performing work for TWC. In 2004, Williams formed a company, Emory Utilities, Inc. ("Emory"), that won a bid from TWC to perform "bury drop" work -- a step in the installation of cable service involving coiling the necessary wiring at the utility pole, burying the line underground to the house, and then coiling the wire at the customer's house. Williams, who is African-American, is the president and sole owner of Emory.

Williams claims he was regularly praised by TWC management for Emory's work. Initially, there were other contractors performing similar work, but Emory's work assignments and territory were increased significantly by TWC; Emory ultimately became the only bury drop

contractor working in TWC's Wilmington region.

Defendant Christopher Hairr began working at the TWC Wilmington location as technical operations manager in October 2008. Hairr was not initially directly in charge of management of the bury drop operation. However, Hairr told David Watkins, who oversaw the bury drop operation, that he wanted to bring in a different contractor to take over some of the work being performed by Emory. Watkins told Hairr that Emory was doing a fine job on bury drops, and TWC did not need any additional contractors to do the work.

On or about January 26, 2009, Hairr took over direct responsibility for the bury drop operation. He brought in Southeastern Cable Contractors, Inc. ("Southeastern") to take over some of Emory's bury drop work. Southeastern, founded in May 2008, is not minority-owned. Hairr's stated rationale was that he did not want all his eggs in one basket. Plaintiffs allege Southeastern was not equipped to manage bury drop operations, and had to hire a subcontractor to handle some of the work.

Plaintiffs also allege Southeastern was paid more for certain bury drop work than Emory, and, despite having less experience than Emory, Southeastern was given all commercial bury drops, which pay more than residential bury drops.

Plaintiffs further allege that from February - April, 2009, Emory out-performed Southeastern and despite this, Emory faced more quality control inspections. In early April 2009, Williams was informed that TWC would no longer have contract work for Emory as of May 1, 2009. Hairr indicated that he only wanted Southeastern doing bury drops. Plaintiffs contend TWC corporate representatives were aware of the allegations of race discrimination, and promised to investigate, but no changes were ever implemented.

## DISCUSSION

A motion to dismiss tests the legal sufficiency of the plaintiff's claims. *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008). The facts are taken in the light most favorable to the plaintiff. *Id.* A claim requires "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citation omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949-50 (2009). When a court can identify well-pleaded factual allegations, a court should assume their truth and then determine whether they plausibly give rise to an entitlement to relief. *Id.*

To state a claim under § 1981, a plaintiff must allege that he is a member of a racial minority, that the defendant intended to discriminate against him on the basis of race, and that the discrimination concerned one of the statutorily enumerated rights such as the right to make and enforce contracts. *Spriggs v. Diamond Auto Glass*, 165 F.3d 1015, 1018 (4th Cir. 1999). "For purposes of this section, the term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). In this case, Plaintiffs allege that Emory, a minority owned business, is a bury drop contractor for TWC. Plaintiffs further allege and plead in their Complaint that Defendants intentionally discriminated against Plaintiffs because of race by favoring a non-minority owned bury drop company with less experience, and paid that company more for the same services. When TWC was made aware of these allegations, Plaintiffs contend they did nothing to remedy the situation, and instead adopted employee Hairr's behavior.

3

While neither the U.S. Supreme Court or the U.S. Court of Appeals for the Fourth Circuit have decided whether a minority owned business can have a § 1981 claim, courts that have addressed the issue have allowed corporations to proceed. *See, e.g., Hudson Valley Freedom Theater v. Heimbach*, 671 F.2d 702, 706 (2nd Cir. 1982) ("We . . . find[] it hard to believe that the Supreme Court would deny standing to the corporation because it 'has no racial identity and cannot be the direct target' of the discrimination, while at the same time . . . deny[ing] standing to the stockholders on the sound ground that the injury was suffered by the corporation and not by them."); *T&S Associates, Inc. v. Crenson*, 505 F. Supp. 938, 943 (D.R.I.1981) (suit by a minority owned corporation and its sole shareholder, under 42 U.S.C. §§ 1981, 1983 and 2000(d) for alleged racial discrimination in the award of a contract; held that the shareholder did not have standing but that the corporation did). The Supreme Court has also recognized a corporation is a person within the meaning of the Fourteenth Amendment. *Santa Clara County v. Southern Pacific R.R. Co.*, 118 U.S. 394 (1886). Therefore, this Court is persuaded that a minority owned business does have standing to pursue a claim under 42 U.S.C. § 1981. Defendants' Motion to Dismiss Emory's § 1981 claim is DENIED.

The same is not true for Plaintiff Williams. "Any claim brought under § 1981 [], must initially identify an impaired 'contractual relationship,' § 1981(b), under which the plaintiff has rights." *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006). *McDonald* makes clear that Williams individually cannot maintain a claim under § 1981. In *McDonald*, the plaintiff was an African-American man and the sole shareholder and president of a corporation that performed construction contracting. Plaintiff filed a § 1981 claim against Domino's Pizza, Inc. ("Domino's") in his personal capacity even though the complaint alleged only a contractual

4

relationship between Domino's and plaintiff's corporation. *Id.* at 472-73, 477. Plaintiff's corporation was not a party to the lawsuit. *Id.* at 473. Domino's filed a motion to dismiss for failure to state a claim. *Id.* at 474. The Supreme Court ruled that "[c]onsistent with our prior case law, and as required by the plain text of the statute, we hold that a plaintiff cannot state a claim under § 1981 unless he has (or would have) rights under the existing (or proposed) contract that he wishes 'to make and enforce.'" *Id.* at 480. The Court went on to say that "it is fundamental corporation and agency law—indeed it can be said to be the whole purpose of corporation and agency law—that the shareholder and contracting officer of a corporation has no rights and is exposed to no liability under the corporation's contracts." *Id.* at 477. In this case, the contract was not with Williams, but with Emory. If there was any violation of § 1981, it was against Emory. Accordingly, Defendants Motion to Dismiss Williams as a plaintiff is GRANTED.

Emory has also stated a claim that Defendant Hairr interfered with their business and contractual relationship. Tortious interference occurs when a third party, without justification, induces one party to contract or not to perform under or enter into the contract, where such action was taken by the third party with knowledge of the business relationship, and the complainant suffers actual harm as a result. *Johnson v. Graye*, 111 S.E.2d 595, 597 (1959). Defendants correctly note that Hairr was a "non-outsider" to the relationship between Plaintiffs and TWC. However, "the non-outsider status of a defendant was immaterial where the allegations in the complaint showed that defendants' motives for procuring the termination of the employment contract were not related to [the company's] business interest in the contract." *Sides v. Duke University*, 328 S.E.2d 818, 829 (1985) (rev'd in part on other grounds). Thus, this issue is

5

whether Hairr was acting based on personal malice or out of personal motives rather than the legitimate business interests of TWC.

> Whether an actor's conduct is justified depends upon the circumstances surrounding the interference, the actor's motive or conduct, the interests sought to be advanced, the social interest in protecting the freedom of action of the actor, and the contractual interests of the other party. Generally speaking, interference with contract is justified if it is motivated by a legitimate business purpose. . . . The privilege, however, is qualified, not absolute; the presumption that an officer's acts are in the corporation's interest and thus justified is overcome when the means or the officer's motives are improper.

*Embree Constr. Group, Inc. v. Rafcor, Inc.*, 411 S.E.2d 916, 924 (1992) (internal citations and quotation marks omitted). In this case, Plaintiffs Complaint suggests Hairr personally benefitted from the contract with Southeastern when he later received a job with them. The Complaint suggests Hairr's motives were improper, for personal benefit, and not in the best interest of TWC. Thus Defendants' Motion to Dismiss claim two against Defendant Hairr is DENIED.

However, Plaintiffs cannot maintain a tortious interference claim against TWC. Both North Carolina and federal courts interpreting North Carolina law have consistently held that a party to a contract cannot tortiously interfere with its own contract. *Waters v. Collins & Aikman Prods. Co.*, 208 F. Supp. 2d 593, 595-96 (W.D.N.C. 2002). *See also, McLaughlin v. Barclays American Corp.*, 382 S.E.2d 836, 841 *cert. denied*, 385 S.E.2d 498 (1989); *Wagoner v. Elkin City Schools' Bd. of Ed.*, 440 S.E.2d 119, 124 (N.C. App. 1994). Therefore, Defendants' Motion to Dismiss Plaintiffs' tortious interference claim against TWC is GRANTED.

The North Carolina Unfair and Deceptive Trade Practices Act ("UTPA") is inapplicable in this case, as the conduct alleged by Plaintiffs does not fall within the protections of the UTPA. "The primary purpose of G.S. § 75-1.1 is to provide a private cause of action for consumers."

6

*Durling v. King*, 554 S.E.2d 1, 4 (2001) (internal quotation marks omitted). Under some circumstances the UTPA may be used by one business against another, but "the Act is not intended to apply to all wrongs in a business setting." *HAJMM Co. v. House of Raeford Farms, Inc.*, 403 S.E.2d 483, 492 (1991). The alleged unfair or deceptive acts must detrimentally affect the marketplace. *Durling*, 554 S.E.2d at 4. "[T]he fundamental purpose of the UTPA is to protect the consumer, and courts invariably look to that purpose in deciding whether the Act applies." *Food Lion, Inc. v. Capital Cities/ABC, Inc.*, 194 F.3d 505, 520 (4th Cir. 1999). In their Complaint, Plaintiffs have only made vague conclusory statements, such as "Race discrimination in contracting is an act in or affecting commerce," and "Defendants' actions [] constitute an inequitable assertion of power, as well as conduct that is immoral, unethical, oppressive, unscrupulous, and in violation of public policy." Plaintiffs have failed to plead specific facts supporting a claim of unfair and deceptive trade practice, and in particular, they have failed to allege that they are consumers of TWC or that TWC's alleged misconduct had an impact beyond the parties. Consequently, Plaintiffs have failed to demonstrate that Defendants' alleged conduct was "in or affecting" commerce for purposes of the UTPA. *See Durling*, 554 S.E.2d at 5 ("[N]o evidence was presented that the subject transactions had any impact beyond the parties' employment relationships. There is no indication that defendant's behavior was 'in or affecting commerce.'"). Therefore, Defendants' Motion to Dismiss claim three is GRANTED.

## CONCLUSION

For the reasons above, Defendants' Motion to Dismiss is GRANTED IN PART. Plaintiff Williams is DISMISSED. Emory's tortious interference claim against TWC is DISMISSED, and the Unfair and Deceptive Trade Practices Act claim is also DISMISSED against both

7

Defendants. Defendants' Motion to Dismiss is DENIED as to Emory's § 1981 claim and the tortious interference claim against Defendant Hairr.

SO ORDERED.

This 9 day of June, 2010.

*[signature]*
TERRENCE W. BOYLE
UNITED STATES DISTRICT JUDGE